Filed 12/22/2014

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PITTSBURG UNIFIED SCHOOL DISTRICT,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>S.J. AMOROSO CONSTRUCTION CO., INC.,<br><br>      Defendant and Appellant. | A138825<br><br>(Contra Costa County<br>Super. Ct. No. JCCP4706) |

This case involves a dispute between a contractor (Amoroso) and school district (the District) about  a construction project the contractor did not complete.  The parties disagree as to whether Amoroso defaulted on the contract, and that issue is not before us.  Rather, this appeal concerns the District's withdrawal of funds from an escrow account in which it had deposited "retention," meaning a percentage of the installment payments made to Amoroso.  The purpose of retaining a percentage of the funds otherwise due the contractor until completion of the contract work is to encourage the contractor to complete the work in a timely and competent manner and to protect the owner against the risk of having to pay a replacement contractor to repair or complete defective or unfinished work.  The District here attempted, after hiring a replacement contractor to complete the work and while its litigation with Amoroso was pending, to withdraw retention funds from the escrow account.  Amoroso sought a preliminary injunction to prevent that withdrawal, arguing the District could not withdraw retention funds until a court determined Amoroso had defaulted.

1

The rule Amoroso urges us to adopt—that a public project owner must await judicial resolution of the underlying contract dispute before it can withdraw retention funds—would undermine the entire purpose for retention. It would deny an owner the funds to complete its project until long after the intended completion date for the project. Amoroso's position is unsupported by logic or law. Our colleagues in this District and the Fifth District have already squarely rejected it. Joining them, we reject it as well.

**BACKGROUND**

This case arises from the reconstruction and modernization of Pittsburg High School. The Pittsburg Unified School District was the owner of the project and S.J. Amoroso Construction Co., Inc. was the general contractor, under a contract entered into on December 10, 2008 (the Construction Contract).

Pursuant to Public Contract Code[1] section 22300, Amoroso elected to have the retention held in an escrow account in the form of securities, with the interest earned on those securities going to Amoroso. The District and Amoroso entered into an escrow agreement (Escrow Agreement) which provided that "District shall have the right to draw upon the securities and/or withdraw amounts from the Escrow Account in event of default by Contractor as determined solely by District."

Disputes between the District and Amoroso began to arise in 2010. The District gave written notice of material breach of the Construction Contract on March 30, 2011, based on Amoroso's failure to complete, timely or at all, any of the three phases of the project.[2] The letter requested that Amoroso cure the deficiencies by April 4, 2011, and threatened termination of the contract if it failed to do so. Amoroso contested the assertions of material breach in a letter dated April 1, 2011. The District sent a notice of termination to Amoroso on April 18, 2011, based largely on the same (still unremedied)

---

[1] Further statutory references are to the Public Contract Code, unless otherwise indicated.

[2] The District's notice letter detailed many specific items it contended Amoroso had not completed, ranging from repair of window leaks in multiple sets of windows to finishing incomplete work on the heating, ventilating and air conditioning system, the lighting, the fencing, and other items.

2

breaches listed in its earlier letter and filed suit against Amoroso the next day. Numerous related cases were filed, and many have been coordinated with this action. These cases involve claims of incomplete and defective work and failure to make payments due to Amoroso and subcontractors.

On April 28, 2011, the District and Amoroso entered into an "Exit and Demobilization Agreement" (Exit Agreement). The stated purpose of that agreement was to provide for "the prompt and orderly exit and demobilization of [Amoroso] from the Project Site in lieu of any final termination or statement of default under the [Construction] Contract."

On February 1, 2013, the District sent a letter to City National Bank, the escrow agent, requesting withdrawal of $3.5 million from the escrow account and attaching a memorandum from the District's counsel as to why such a withdrawal was permissible.

Amoroso filed an ex parte application for a temporary restraining order (TRO) and an order to show cause why a preliminary injunction should not issue. The parties stipulated to an order directing that no funds would be disbursed until the court ruled on the motion for preliminary injunction. On April 16, 2013, the court issued a tentative ruling denying the motion for preliminary injunction. On May 9, 2013, the court affirmed that tentative ruling.

Amoroso timely filed a notice of appeal on May 22, 2013.

## DISCUSSION

### I. *Standard of Review*

"In determining whether to issue a preliminary injunction, the trial court considers: (1) the likelihood that the moving party will prevail on the merits and (2) the interim harm to the respective parties if an injunction is granted or denied. The moving party must prevail on both factors to obtain an injunction. Thus, where the trial court denies an injunction, its ruling should be affirmed if it correctly found the moving party failed to satisfy either of the factors. [Citation.]

3

"Where the evidence before the trial court was in conflict, its factual determinations, whether express or implied, are reviewed for substantial evidence. We interpret the facts in the light most favorable to the prevailing party. [Citations.]

"Generally, the standard of review for denial of a preliminary injunction is whether the trial court committed an abuse of discretion. However, a party's likelihood of prevailing on the merits sometimes can be determined as a matter of law. [Citation.] In that case, de novo review as to that factor is proper. [Citation.]" (*Sahlolbei v. Providence Healthcare, Inc.* (2003) 112 Cal.App.4th 1147, 1145-1146.)

## II. *Analysis*

### A. *Legal Background Concerning Retention Funds*

"[I]t is common for construction contracts to contain terms that protect an owner's construction funds. Owners and contractors generally structure their contracts to provide for installment payments to the contractor as the work progresses, typically as the work reaches specified stages of completion. [Citation.] 'This payment system adds incentive for the contractor to complete the work and reduces the risk of nonperformance for the owner. A percentage of funds held until completion of all of the work is called retainage and is intended both to reduce the risk of nonperformance by the contractor and to assure the completion of the work in accordance with the contract terms.' " (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 55 (*Cates*), fn. omitted.) If the contractor defaults on the construction contract "then the owner is entitled to use the retained funds to complete the contract. In fact, this is one of the primary reasons for which the owner insists on retainage in the first place." (2 Stein, Construction Law, (2014) Conflicting Claims to Retainage, ¶ 7.11[1]; see *Cates*, *supra*, 21 Cal.4th at p. 55 ["if an owner avoids overpaying the contractor as the project progresses, then the owner should have funds available to apply toward completion of project in event of contractor's default"]; *Westamerica Bank v. City of Berkeley* (2011) 201 Cal.App.4th 598, 610-611 (*Westamerica*) [retention funds are under control of owner who can use them if contractor defaults on its obligations].)

4

A retention fund typically consists of cash that is a percentage of each progress payment, which the owner retains to be paid at the completion of the project. By statute, retention withheld from payments made by a public entity must be released to the contractor within 60 days after completion of the project. (§ 7107, subd. (c).) A public entity may withhold from such payment up to 150 percent of any amount that is in dispute between it and the contractor. (*Ibid*.) Failure to pay retention as required by this section exposes the public entity owner to penalty interest on amounts improperly withheld and an award of attorneys' fees. (§ 7107, subd. (f).)

In 1981,[3] the Legislature adopted a statute enabling contractors to substitute securities of equivalent value in lieu of cash retention amounts or, if retention is held in an escrow account, to direct that the escrow agent invest retention funds in such securities. (§ 22300, subds. (a), (b).) This enables contractors to earn interest on retained funds, while in turn requiring contractors to offer the same option to subcontractors from whom the contractor withholds a retention. (See § 22300, subds. (b), (c), & (d); *Westamerica*, *supra*, 201 Cal.App.4th at p. 602.) Section 22300 prescribes a form escrow agreement (§ 22300, subd. (f)), which provides, among other things, that the public entity owner agrees, to the extent there are securities in the escrow account equal in value to the retention amounts that would otherwise be withheld, not to withhold retention from progress payments (§ 22300, subd. (f)(2)) and that the contractor may withdraw interest earned on the securities or interest earned on interest at any time. (§ 22300, subd. (f)(5).) The agreement also provides that the owner has "a right to draw upon the securities in the event of a default by the Contractor" and requires the escrow agent, "[u]pon seven days' written notice . . . from the owner of the default," to "immediately convert the securities to cash and [to] distribute the cash as instructed by the Owner." (§ 22300, subd. (f)(7).)

---

[3] Section 22300 was enacted in 1988. (Stats. 1988, ch. 1408, § 11.). However, the legislation was not a substantive change but simply a recodification of law previously set out in the Government Code. (Legis. Counsel's Dig., Assem. Bill No. 4351 (1987-1988 Reg. Sess.); *Westamerica*, *supra*, 201 Cal.App.4th at pp. 611-612 [discussing former Govt. Code § 4590].)

The key issue raised by Amoroso is whether a public entity owner that has entered into an agreement providing for a retention may unilaterally determine that a contractor has defaulted on its obligations under the construction agreement as a prelude to drawing on funds or securities held in a retention account. Two cases have addressed that issue, albeit in slightly different contexts.

## B. Westamerica *and* Opinski *Permit Owners Unilaterally to Declare a Default for Purposes of Accessing Retention Funds, Prior to Any Judicial Determination*

Our colleagues in Division Four recently addressed the precise issue we consider here, in *Westamerica*. Justice Rivera's opinion in that case is particularly helpful. In *Westamerica*, the City of Berkeley had entered into a construction agreement with Arntz Builders (Arntz) to build a public library, and the agreement provided for a retention escrow account to ensure completion of the work. (*Westamerica*, *supra*, 201 Cal.App.4th at pp. 602-603.) The terms of the escrow agreement were as prescribed by Section 22300, and the escrow account contained securities. (*Id.* at pp. 600, 603.) In the midst of litigation between the city, Arntz, and subcontractors, Arntz sought a TRO and preliminary injunction to prevent the city from withdrawing securities from the account. (*Id.* at pp. 603-604.) While Arntz's motion was pending, the city sent a seven-day notice to the bank stating Arntz was in default and demanding that the bank immediately liquidate the securities and distribute the cash to the city. (*Id.* at p. 604.) The trial court denied the motion, "reject[ing] Artnz's contentions (1) that the securities are Arntz's property because the City had not paid Arntz in full for the work done under the Library contract, (2) the City must first prove its own contractual performance and its right to the securities, and (3) that Arntz would be irreparably harmed if the securities were converted to cash and distributed to the City." (*Ibid.*)

In the meantime, Arntz wrote to the bank objecting to the city's demand, disagreeing with the city's claims that it was in default and threatening to sue the bank if it released the securities to the city. (*Westamerica*, *supra*, 201 Cal.App.4th at p. 604.) Instead of releasing the funds, the bank, at Arntz's urging, filed a complaint in interpleader. (*Id.* at pp. 604-605.) The city demurred. (*Id*. at p. 605.) The trial court

sustained the demurrer, and on appeal, Division Four of this Court affirmed. (*Id*. at p. 615.)

The bank claimed that, under the escrow agreement, it "face[d] 'conflicting instructions' regarding whether the securities should be released to the City, and therefore it [was] entitled to interplead the funds and to force Arntz and the City to litigate this issue." (*Westamerica*, *supra*, 201 Cal.App.4th at p. 609.) It argued that " 'the City and Arntz each claim[ed] rights to the securities, and have provided [the bank] with conflicting instructions, which the bank is *contractually* obligated to comply with.' " (*Id*. at p. 610.)

The Court disagreed: "[T]he Bank cites to no provision in the escrow agreement that would contractually obligate it to accede to Artnz's request to halt the liquidation and disbursement of the securities in the face of the City's demand. Indeed, any claim by Arntz that it has a *contractual* right to demand that the securities be withheld would constitute a unilateral change in the terms of the escrow agreement, which is not permitted, either under common law [citation], or by statute (§ 22300, subd. (f) ['The escrow agreement . . . shall be null, void, and unenforceable unless it is substantially similar to the [prescribed] form'].) [¶] Our conclusion that the escrow agreement authorizes the City unilaterally to declare a default and to receive a distribution of the escrowed securities comports fully with the fundamental purpose of retentions. As we have discussed, retained earnings serve as an incentive for timely completion of the contract. They are effective for this purpose precisely because they are under the control of the owner who can use them if the contractor defaults on his obligations. ([*Cates*], *supra*, 21 Cal.4th at pp.55-56 . . . .) Of course, the owner does so at its peril and can be subject to hefty penalties and attorney fees if it is shown that all or part of the retention should have been released to the contractor. (§ 7107.) The statutory scheme thus provides to the contractor a powerful remedy for wrongful withholding of the retention fund, but it does not allow the contractor to obstruct the public entity's control over it. The Bank's theory would require a different result for escrowed retention funds, viz., the mere threat of suit by the contractor could force the owner into litigation in order to

7

access *its own* retention fund.  We do not think the Legislature intended that public entities be disadvantaged in this way when it adopted the law requiring that contractors be allowed to substitute escrowed funds for retentions." (*Westamerica*, *supra*, 201 Cal.App.4th at pp. 610-611.)[4]

The same year our Division Four decided *Westamerica*, the Fifth District addressed the same question in another context, and reached the same conclusion.  In *Greg Opinski Construction, Inc. v. City of Oakdale* (2011) 199 Cal.App.4th 1107 (*Opinski*), the city and contractor had litigated, and the city had prevailed, in a dispute over a construction project.  (*Id.* at p. 1109.)  The trial court had awarded the city contract damages and prejudgment interest on those damages.  (*Ibid.*)  The Court of Appeal affirmed the judgment except as to the award of prejudgment interest, which it reversed. (*Id*. at p. 1122.)  In overturning the award of prejudgment interest, the court relied on the rule that a party who "has dominion and control over money that is awarded to it as damages . . . is not entitled to prejudgment interest for that period." (*Id*. at p. 1119.)  The parties' escrow agreement conformed to the model agreement prescribed in section 22300, subdivision (f), and thus provided that "the owner is entitled to convert the securities to cash and withdraw the cash 'in the event of default by the Contractor.' " (*Id*. at pp. 1119-1120.)  Although the escrow agreement in that case held only cash and not securities, the court held that the owner could "withdraw the principal in the escrow account regardless of its form." (*Id*. at p. 1120.)

---

[4] In interpreting section 22300 and its required form of escrow agreement, Justice Rivera noted that the bill adding that form initially "did not include the paragraph authorizing the public agency to make a demand on the escrow holder to liquidate and distribute the escrowed securities," which was added after a number of public entities "wrote letters opposing the bill, because it lacked any provision by which the public agencies could access the escrowed funds." (*Westamerica*, *supra*, 201 Cal.App.4th at p. 611.)  Thereafter, "[t]he bill was amended to include the paragraph proposed by [one of the objecting parties]" allowing public entity owners to demand liquidation and distribution upon written notice of default. (*Id.* at 612.).  As Justice Rivera observed, the amendment reflects "lawmakers' intent to ensure that public agencies have expeditious access to the substituted retention funds." (*Ibid.*)

"The purpose of the practice of withholding retention payments is to give the owner security in case of breach by the contractor. Nothing in . . . section 22300 evinces a legislative intent to limit an owner's recourse. Although paragraph 7 of the model escrow agreement (and the parties' actual escrow agreement) does not expressly state that an owner can withdraw cash if the contractor defaults and the account never contained securities, the inclusion of that paragraph presupposes that the owner has a right to possession of the retention when the owner deems the contractor to be in breach. The purpose of withholding retention would be undermined if this were not the case, and there is no reason why the form of the retention—securities or cash—would make a difference in this regard. For these reasons we conclude that the city had the power to withdraw the money from the escrow account when it determined that Opinski had breached the contract. Therefore, it had dominion and control over the money from the time of the breach and was not entitled to prejudgment interest." (*Opinski*, *supra*, 199 Cal.App.4th at p. 1120. )

Amoroso argues that, despite the authority of *Westamerica* and *Opinski*, a public agency may not unilaterally declare a default and demand that the escrow holder liquidate securities and distribute funds. It first contends "[t]he trial court fundamentally misconstrued *Opinski* and *Westamerica*, by stating that '[i]n neither *Westamerica* nor *Opinski* was there any judicial determination as to whether a default had occurred.' " Amoroso contends that "[i]n each of those cases, a court made a judicial determination prior to the request for withdrawal from the escrow agent." The trial court was correct. It is Amoroso that has "fundamentally misconstrued" these cases.

In *Westamerica*, the city demanded that the bank liquidate and release the retention at a time when there had been no final resolution of the pending construction litigation between the city and the contractor. At that time, in July 2008, an appeal was pending from "Phase I" of the trial—in which the trial court had decided only that the contractor's action "was barred for failure to comply with Government Code claim requirements." (*Westamerica*, *supra*, 201 Cal.App.4th at p. 604.) Thus, not even the trial court had addressed whether the contractor had defaulted on the contract. In its July 15,

9

2008 letter to the bank, 10 days before the hearing on the request for a TRO to enjoin the bank from disbursing the retention funds to the city, the contractor denied it was in default and claimed the project had been deemed complete in 2003.  (*Ibid.*)  The entire thrust of the bank's interpleader action filed on July 28, 2008, was that there was "a dispute" between the city and the contractor regarding, among other things, the " 'existence of a default.' "  (*Id*. at 605.)  These facts simply cannot be squared with Amoroso's characterization of the case as involving "judicial determination [that the contractor had defaulted on the contract] prior to the request for withdrawal from the escrow agent."

Not only does Amoroso seriously misstate the facts in *Westamerica*, it also ignores the court's reasoning.  In affirming the trial court's ruling sustaining the city's demurrer to the bank's interpleader complaint, the court necessarily rejected the bank's (and contractor's) contention that the city was not entitled to make, and the bank therefore could not honor, a demand for the disbursement of the retention funds to the city before judicial resolution of whether the contractor was in default.  The language of the court's opinion leaves no ambiguity on this point:  "Our conclusion that the escrow agreement authorizes the City *unilaterally* to declare a default and receive a distribution of the escrowed securities comports fully with the fundamental purpose of retentions." (*Westamerica*, *supra*, 201 Cal.App.4th at p. 610, italics added.)  "If the City gives notice of the contractor's default and demands liquidation of the securities and distribution of the funds, the Bank must 'immediately convert the securities to cash and . . . distribute the cash as instructed by the City.' "  (*Id*. at p. 612.)  Amoroso's attempt to deny this aspect of the *Westamerica* holding is inexplicable.

Amoroso's similar attempt to distinguish *Opinski* is no more persuasive.  It is true that by the time the appellate court decided whether the trial court properly awarded prejudgment interest to the City of Oakdale, the trial court had issued (and the Court of Appeal had decided to affirm) a decision in favor of the city on its claims for delay damages and construction defects.  But the primary issue in that case was *pre*judgment interest, and the rule the court applied was that "if, *during any prejudgment period*, a

10

party has dominion and control over money that is awarded to it as damages, it is not entitled to prejudgment interest for that period." (*Opinski*, *supra*, at p. 1119, italics added.) The court denied prejudgment interest because it concluded that the city had dominion over the retention funds well prior to the judgment: "[W]e conclude that the city had the power to withdraw the money from the escrow account *when it determined that Opinski had breached the contract*. Therefore, it had dominion and control over the money *from the time of breach* and was not entitled to prejudgment interest." (*Id*. at p. 1120, italics added.) The court thus squarely decided that the city had the right to withdraw escrowed funds immediately upon its own determination that the contractor had defaulted; it did not have to wait for a judicial decision on that issue.

## C. *Neither Civil Code Section 1670 Nor Due Process Compel a Different Result*

Amoroso next argues that, notwithstanding the *Westamerica* and *Opinski* courts' interpretation of section 22300 to grant project owners authority to withdraw retention funds immediately upon a contractor's default, Civil Code section 1670 and the Due Process Clause prevent public agencies from exercising that authority. This argument was not raised by the parties in *Westamerica* or *Opinski*, and the courts in those cases therefore did not address it. It raises an issue of statutory construction, to which we now turn.

In 1978, the Legislature enacted Civil Code section 1670, which provides: "Any dispute arising from a construction contract with a public agency, which contract contains a provision that one party to the contract or one party's agent or employee shall decide any disputes arising under that contract, shall be resolved by submitting the dispute to independent arbitration, if mutually agreeable, otherwise by litigation in a court of competent jurisdiction." (Stats. 1978, ch. 1374, § 1, p. 4556.) This legislation was enacted in response to *Zurn Engineers v. State of California ex rel. Dept. Water Resources* (1977) 69 Cal.App.3d 798 (*Zurn*), which held that a construction contract that "contained provisions authorizing the State Engineer, or his designated representative, to decide disputes including claims for extra compensation between Contractor and State and making his decision 'Final and conclusive unless it is fraudulent or capricious or

arbitrary or so grossly erroneous as necessarily to imply bad faith,' " deprived the contractor of due process (*id.* at p. 802, fn. omitted, 833). (See Sen. Com. on Judiciary, Rep. on Sen. Bill No. 2197 (1977-1978 Reg. Sess.), p. 2 ["The bill stems from a recent appellate decision which dismayed the construction industry: *Zurn Engineers v. The State of California* (1977), 69 Cal. App. 798."]; Assem. Com. on Judiciary, Bill Digest on Sen. Bill No. 2197 (1977-1978 Reg. Sess.) Aug. 17, 1978, p. 2 ["Senate Bill 2197 was introduced in response to . . . (*Zurn Engineers* v. *State of California ex Rel. Department Water Resources* 69 CA 3d 798 at page 828.)"].) At minimum, the *Zurn* court held, the contractor was entitled to notice of the matters on which the State Engineer intended to rely and an opportunity to refute or supplement that information. (*Zurn*, at p. 833.)

Amoroso contends that allowing a public entity owner to access retention funds based on its own determination that there has been a default runs afoul of Civil Code section 1670 and the due process clause in that it allows the owner to make a unilateral decision on a dispute with a contractor. We disagree with Amoroso's argument that the Escrow Agreement here or the form escrow agreement embodied in section 22300 are in conflict with Civil Code section 1670 or violate due process.

The first problem with Amoroso's argument is that Civil Code section 1670 by its terms applies only to "construction contract[s]." The dispute at issue here concerns the parties' rights and obligations under the Escrow Agreement, not those governed by the Construction Contract. True, the parties disagree whether Amoroso defaulted on the Construction Contract. But that dispute will not be resolved by the District unilaterally. On the contrary, that dispute, insofar as it arises under the Construction Contract, is the subject of ongoing litigation between these parties in the Superior Court. Here, the only question is whether the Escrow Agreement allows the District to determine there has been a default for the limited purpose of providing the notice to withdraw retention funds under the Escrow Agreement. That dispute concerns the Escrow Agreement, which is not governed by Civil Code section 1670. But even if the dispute about whether there

12

was a default within the meaning of the Escrow Agreement could be said to arise from the Construction Contract, Amoroso's argument fails for other reasons.

The form escrow agreement prescribed by section 22300, subdivision (f), expressly permits an owner to "draw upon the securities" in a retention account "in the event of a default by the Contractor"— with the only prerequisite being "seven days' written notice to the Escrow Agent." On receiving such notice, the escrow agent "shall *immediately*" (and thus without having to wait for litigation) "convert the securities to cash and *shall* distribute the cash as instructed by the Owner." (§ 22300, subd. (f)(7), italics added.) As we have previously discussed, this Court in *Westamerica* and the Fifth District in *Opinski*, interpreted the statutory agreement in accord with its plain meaning: to authorize a public entity owner "unilaterally to declare a default and to receive a distribution of the escrowed securities" on seven days' notice. (*Westamerica*, *supra*, 201 Cal.App.4th at p. 610.) Thus, Amoroso asks us to hold that Civil Code section 1670 bars the very same contract provision that the Legislature prescribed for public entities three years later in Public Contracts Code section 23300.[5]

In construing Civil Code section 1670, we must attempt to harmonize that section with Public Contracts Code section 22300. As our Supreme Court recently observed: " 'A court must, where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions. [Citations.] This rule applies although one of the statutes involved deals generally with a subject and another relates specifically to particular aspects of the subject.' [Citation.] Thus, when ' "two codes are to be construed, they 'must be regarded as blending into each other and forming a single statute.' [Citation.] Accordingly, they 'must be read together and so construed as to give effect, when

---

[5] The Legislature enacted section 1670 in 1978, three years before it adopted what is now Public Contracts Code section 22300 in 1981, and eight years before it added the form contract in 1986. (*Westamerica*, *supra*, at p. 611, citing Stats. 1981, ch. 866, § 1, pp. 3322-3323 and Stats. 1986, ch. 1167, § 1, pp. 4155-4158.)

possible, to all the provisions thereof.' [Citation.]" ' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805 (*Pacific Palisades*).)

As discussed above, subdivision (f)(7) of section 22300 specifically permits public entity owners to withdraw retention funds or securities immediately upon determining that the contractor is in default. In order to read the broad and general language of section 1670 to require a public entity owner to submit the issue of the contractor's default to litigation (or arbitration) and to obtain a final ruling on that issue before withdrawing retention amounts under an escrow agreement governed by section 22300, we would have to conclude that the more recently enacted section 22300 partially repealed section 1670 by implication. However, as our high Court also noted in *Pacific Palisades*, " ' " '[a]ll presumptions are against a repeal by implication. [Citations.]' [Citation.] Absent an express declaration of legislative intent, we will find an implied repeal 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation." ' [Citation.]" ' " (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 805.)

Further, Amoroso's is not a plausible interpretation of section 1670. If it were adopted, a public project owner could not reject a proposed change order, demand that a contractor replace defective work, terminate a contract, or call on the surety to complete the work without first arbitrating or litigating each disagreement to conclusion. The parties would be required to stop and arbitrate or litigate *first*, before the owner could take any action in regard to any of the hundreds of disagreements that arise in the course of constructing any significant public works project. Projects would be delayed repeatedly to litigate or arbitrate disputes and could take decades to complete, and project funds would be depleted by the expenses of serial litigation or arbitration.

A more plausible reading of Civil Code section 1670, and one that harmonizes it with section 22300, can be derived by reading the phrase "decide any disputes" in the context of the *Zurn* case and the due process concerns it addressed. Civil Code section 1670 can be understood to require litigation or arbitration to *finally* resolve

14

disputes that affect a contractor's entitlement to compensation. To "decide" something means "to bring [it] to an end; to determine, as a question, contest, controversy, or struggle, by some recognized authority; to settle in favor of one side or the other; to determine the issue or result of; as the court *decided* the case for the plaintiff." (Webster's New Twentieth Century Dict., Unabridged (2d ed. 1975) p. 470, col. 2.) These definitions imply finality.

As described above, the state construction contract in *Zurn* permitted a state official to finally resolve a claim by the contractor that it was entitled to extra compensation for additional work requested by the owner subject only to a requirement that the official not act fraudulently or in bad faith. (*Zurn*, *supra*, 69 Cal.App.3d at p. 802.) Before making that decision, the state official had failed to advise the contractor of the evidence upon which he intended to rely and failed to give the contractor a reasonable opportunity to refute or supplement that evidence. (*Id.* at p. 833.) *Zurn* thus stands for the proposition that a public entity cannot, consistent with due process, make a final decision about a contractor's right to payment without at least affording adequate notice and an opportunity to be heard. Civil Code section 1670, to be sure, goes further, requiring the government to submit disputes to arbitration or litigation. But in responding to *Zurn*, it is likely that the Legislature intended Civil Code section 1670 to address situations such as that in *Zurn*, in which the State was allowed to make a final decision in regard to a contractor's compensation.

A demand for a distribution from a retention escrow account is not a final resolution of whether a contractor defaulted the contract, such as by failing to perform or by performing defective work; nor does it permanently resolve whether and what amount the owner owes and must pay the contractor. The owner does not "decide" a dispute in the sense of resolving it with finality, permanently taking funds or securities claimed by the contractor. The owner may withdraw retention funds or securities and use them to repair or complete the project, but this does not preclude the contractor from challenging that decision thereafter. If litigation (or arbitration) under the construction contract is ultimately resolved in favor of the contractor, the court (or arbitrator) will require the

15

owner to pay the amount owed, including returning any improperly withheld retention. Indeed, if the owner's withholding of retention is ultimately found unjustified, it will also be liable for penalty interest and attorney fees. (§ 7107, subd. (f) ["In the event that retention payments are not made within the time periods required by this section, the public entity . . . withholding the unpaid amounts shall be subject to a charge of 2 percent per month on the improperly withheld amount, in lieu of any interest otherwise due. Additionally, in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to attorney's fees and costs."].)

Because a distribution to the owner from a retention escrow fund does not "decide" the issue of whether the contractor is in default (and because it does not raise a dispute under the construction contract but only the escrow agreement), section 22300 and Civil Code section 1670 are not in conflict.

Amoroso also argues that such a distribution violates its rights to due process. We reject that argument because retention funds are not akin to contract payments either for contract work or extra work as was the issue in *Zurn*. Unlike a progress payment or payment for extra or change order work, a contractor has no claim to retention funds until the project is completed. In *Harsco Corporation v. Department of Public Works* (1971) 21 Cal.App.3d 272 (*Harsco*), the court held that retention funds are not earned by the contractor until the project is completed within the project price and thus that a stop notice filed by an unpaid subcontractor did not reach the retention. (*Id.* at pp. 276-278.) *Harsco* interpreted the public works retention statute, former Gov. Code section 14402.[6] (*Id.* at p. 278.) *Harsco* also relied on *Dorris v. Alturas School District* (1914) 25 Cal.App. 30, 32-33 (*Alturas School District*), which interpreted contract terms to mean retention was not due until completion and thus was not "due" to the contractor within the meaning of the stop notice statute. (*Harsco* at p. 277.) The current retention statutes similarly reflect that completion is a condition to earning payment of retention funds.

---

[6] Government Code section 14402, interpreted in *Harsco* is the predecessor to current Public Contracts Code section 10261. (*East Quincy Services Dist. v. General Accident Ins. Co. of Am.* (2001) 88 Cal.App.4th 239, 244, fn. 18.)

(See § 7107, subd. (c) [within 60 days after date of completion of work]; § 10261 [department shall withhold amount not exceeding 5 percent, or higher amount if project is substantially complex, "until final completion and acceptance of the project"].) Further, as in *Alturas School District*, in this case the terms of the Construction Contract make plain that Amoroso had no right to the retention funds (or the securities provided in lieu of funds) until the project was completed.

Amoroso points out that even nonfinal judicial determinations may in some instances constitute a taking that implicates due process protections. Amoroso cites cases involving garnishment of wages (*Sniadach v. Family Fin. Corp. of Bay View* (1969) 395 U.S. 337, 342) and recording of mechanics' liens. (*Connolly Development, Inc. v. Superior Court* (1976) 17 Cal.3d 803, 813-814; *Lambert v. Superior Court* (1991) 228 Cal.App.3d 383, 388.) However, until a project has reached final completion, retention funds—unlike a worker's wages or a property owner's title—are not property of the contractor over which it exercises control. (*Harsco*, *supra*, 21 Cal.App.3d at pp. 276-280; see *Westamerica*, *supra*, 201 Cal.App.4th at pp. 611 [referring to "public entities' control" over retention funds, with which section 22300 was not intended to interfere].) Thus, an owner's declaration of default to receive a distribution from escrowed retention funds, pursuant to section 22300, does not constitute a prejudgment taking of a contractor's own funds or other property, such as occurs with wage garnishment or a mechanic's lien, and does not raise due process concerns.

When an owner declares a default and requests a distribution from the escrowed retention, the contractor is deprived of no funds or property over which it could have exercised any control. If the owner wrongfully declares a default and the contractor is due payment of the retention, then the contractor may obtain that payment through litigation or arbitration (along with the heavy penalties on the owner provided by section 7107), but in the meantime, the contractor suffers no deprivation of an interest in property over which it had control prior to the litigation. In such circumstances, the judgment and section 7107 penalties ensure that the contractor will be made whole. Nothing in this scheme violates due process.

**D.** *The Escrow Agreement was Not Null, Void, and Unenforceable*

Section 22300, subdivision (f), provides that a retention fund escrow agreement is "null, void, and unenforceable" if it is not "substantially similar" to the form escrow agreement provided in the statute. Subdivision (f)(7) of the form escrow agreement provides: "The Owner shall have a right to draw upon the securities in the event of default by the Contractor." The Escrow Agreement between the District and Amoroso provides: "District shall have the right to draw upon the securities and/or withdraw amounts from the Escrow Account in the event of default by Contractor as determined solely by District."

Amoroso argues that the Escrow Agreement is null, void, and unenforceable because the actual agreement is not substantially similar to the model agreement. We disagree. Because we agree with *Westamerica* and *Opinski* that the form agreement allows a public entity owner to make a unilateral determination of default for purposes of withdrawing retention, there is no material difference between the Escrow Agreement and the statutory form agreement.

**E.** *The Exit Agreement Did Not Prevent the District from Exercising its Rights under the Escrow Agreement*

Recital G of the Exit Agreement states: "The Parties desire to enter into this Exit Agreement for the prompt and orderly exit and demobilization of [Amoroso] from the Project Site in lieu of any final termination or statement of default under the [Construction] Contract." Amoroso argues that recital G precludes the District from giving the escrow agent notice of a default and, thus, from obtaining a distribution of retention funds from the escrow account.

In addressing this argument, the trial court's ruling states: "This argument confuses two different contractual requirements. Under the [Construction] Contract, there are procedural requirements for [the District] to terminate the contract and make a statement of default. The Exit Agreement, entered into by the parties to allow [Amoroso's] 'prompt and orderly exit' from the project, was signed after [the District]

18

had already given [Amoroso] written notice of material breach, served a Notice of Termination, and filed suit.  [Citation.]  Clearly 'in lieu of . . . a statement of default,' did not mean that the exit agreement waived [the District's] right to assert that [Amoroso] was in default, but only that the parties had decided on procedures for [Amoroso's] exit from the project to apply 'in lieu of' the requirements in the [Construction] Contract for termination and statement of default.  Moreover, the Escrow Agreement does not require [the District] to make a 'statement of default' but rather says that [the District] can withdraw funds 'in event of default by Contractor as determined solely by District.'  [Citation.]  [¶]  All [the District] had to do to withdraw funds was make a determination that [Amoroso] was in default.  This it has clearly done, as evidenced by the Notice of Material Breach, the Notice of Termination, and the filing of the lawsuit."

The trial court's ruling turned on a distinction between what was meant by a "statement of default under the [Construction] Contract" in the Exit Agreement and the notice of default that the District must provide to the escrow agent, pursuant to the Escrow Agreement, to receive a distribution from the escrow account.  Whether the trial court erred involves a question of contract interpretation, which we review de novo. (*Crosby v.HLC Properties, Ltd.* (2014) 223 Cal.App.4th 597, 602.)  When interpreting a contract, we endeavor "to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  (Civ. Code, § 1636.)  In doing so, we "consider the ' "clear and explicit" meaning of [the contract] provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." ' "  (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288.)

Recital G employs the term "statement of default under the [Construction] Contract."  Neither party cites a definition of "statement of default" in the Construction Contract.  Instead, the parties refer to Article 24.1.2.1 of the general conditions of the Construction Contract which provides, in relevant part:  "Upon the occurrence at District's sole determination of any of the above conditions, District may, without prejudice to any other right or remedy, serve written notice upon Contractor and its

19

Surety of District's termination of this Contract and/or the Contractor's right to perform the work of the Contract. This notice will contain the reasons for termination. Unless, within three (3) days after the service of the notice, any and all condition(s) shall cease, and any and all violation(s) shall cease, or arrangement satisfactory to District for the correction of the condition(s) and/or violation(s) be made, this Contract shall cease and terminate."[7] Article 24.1.2.1 does not employ the phrase "statement of default," but because both parties cite this article in the Construction Contract, it appears they agree that a "statement of default under the [Construction] Contract" is the District's notice to the contractor that certain "conditions" have been determined that can lead to contract termination if they are not promptly corrected and suspension of further payment until the project is completed.[8]

As interpreted by both parties, a "statement of default under the [Construction] Contract" is a communication from the District to Amoroso that has specified consequences under the Construction Contract. This is clearly not the same as the notice of default required by the Escrow Agreement, which is a communication from the District to the escrow agent that has, in and of itself, no consequences pursuant to the Construction Contract; its consequences, that the District becomes entitled to a distribution of retention, flow from the Escrow Agreement. Accordingly, we agree with the trial court that if the "in lieu of" language prevents the District from issuing a "statement of default under the [Construction] Contract," it does not also prevent the

_____

[7] The record before this Court, and apparently in the court below, contains only excerpts of the general conditions portion of the Construction Contract, which do not include section 24.1.2.1. However, as both parties cite to a letter that quotes this section, and neither party has objected to its omission, we rely on it as well.

[8] Amoroso's counsel stated at the hearing in the trial court that Amoroso had "never been called in default for termination" and that "if a public entity actually goes through formal termination, it would affect [the contractor's] ability to bid [on] other work." This, too, suggests that the exchange described in recital G was that the District gave up the right to proceed with termination under the Construction Contract in exchange for Amoroso agreeing to exit and demobilize from the project in an orderly way.

20

District from providing a notice of default under the Escrow Agreement. The Exit Agreement does not prevent the District from asserting that Amoroso is actually in default of the Construction Contract in contexts not "under the [Construction] Contract," such as in a notice of default to the escrow agent. Indeed, the District's claim that Amoroso so defaulted is the essence of the District's suit against Amoroso.

In short, we agree with the trial court's ruling on Amoroso's argument based on the Exit Agreement.

## F. *The District Determined that Amoroso was in Default*

Amoroso contends that the District had not made a "formal declaration of a default, much less an actual default by Amoroso that would permit a demand to be made on the [funds] held in escrow."

The trial court's ruling stated: "All [the District] had to do to withdraw funds was make a determination that [Amoroso] was in default. This it has clearly done, as evidenced by the Notice of Material Breach, the Notice of Termination, and the filing of the lawsuit."

Whether the District determined that Amoroso was in default is a question of fact, which we review for substantial evidence. We agree with the trial court that the notice of material breach, the notice of termination, and the filing of the lawsuit provide substantial evidence that the District determined Amoroso to be in default.

Amoroso relies on the letter that the District sent to the escrow agent requesting a distribution from the escrow account—a letter that failed to contain a notice of default. Instead, the letter was accompanied by a memorandum from counsel for the District that Amoroso argues "admitted that [the District] had made no formal determination of default by Amoroso."

The memorandum from the District's counsel states: "The District's position is that [Amoroso] defaulted by failing to perform the work consistent with the specifications under the contract." A footnote to the sentence states: "While we do not believe further Board action is necessary to authorize drawing upon the securities and/or escrow account, the District's Board may wish to make a formal 'determination' that [Amoroso] has

21

defaulted consistent with the Public Contract Code, the [E]scrow [A]greement, based upon the Exit and Demobilization Agreement.  That step would eliminate any procedural argument [Amoroso] might make to challenge the draw upon escrow."  Contrary to Amoroso's argument, the memorandum clearly states that the District had determined Amoroso to be in default, but recognizes that the determination had not been formalized by a District board action.  Because section 22300 requires only a notice of the default to the escrow agent and not a formal determination of default by the governing board of the public agency prior to such notice, the memorandum is not an admission that the District had not determined Amoroso to be in default.[9]

## G.  *The Retention Funds Were Not Held by the District in Trust for Subcontractors*

A preliminary injunction may issue to enforce obligations that arise from a trust.  (Code Civ. Proc., § 526, subd. (a)(7).)  Amoroso maintains that "the funds in the escrow account are impressed with an express trust."  Amoroso relies on *Chang v. Redding Bank of Commerce* (1994) 29 Cal.App.4th 673 (*Chang*) and *People v. Clemmons* (1955) 136 Cal.App.2d 529 (*Clemmons*).  Neither case supports Amoroso's position.

In *Chang*, the owner made payments to the general contractor for the purpose of paying subcontractors.  (*Chang*, *supra*, 29 Cal.App.4th at p. 677.)  The contractor issued checks to the subcontractors, but the bank reversed the transactions and seized the money to set off money the contractor owed to the bank.  (*Ibid.*)  The court concluded that "progress payments received by a general contractor pursuant to a contract which requires that they be paid to subcontractors are held by the contractor in trust for the benefit of the subcontractors" and that a bank with inquiry notice that the funds were paid in trust cannot seize the funds to cover an indebtedness of the contractor to the bank.  (*Id.* at p. 678.)

---

[9]  The trial court did rule that the District had not complied with the Escrow Agreement in its request for a distribution from the escrow account, but that deficiencies in the notice provided to the escrow agent "are not legal grounds for the Court to enjoin the distribution of funds to [the District]."  Amoroso does not challenge this ruling.

In *Clemmons*, a contractor was convicted of grand theft for misappropriating funds from a construction loan obtained by the owners of the project. (*Clemmons*, *supra*, 136 Cal.App.2d at pp. 530-534.) When the contractor received the loan proceeds, he signed a "trust receipt" stating that he received the funds "in trust, and as bailee, for the express use" of paying construction-related expenses. (*Id.* at p. 532.)

Amoroso argues that the escrowed retention funds are subject to an express trust in favor of the subcontractors because the Construction Contract requires that "the Contractor shall pay to each Subcontractor, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled." Amoroso maintains: "Under *Chang* and *Clemmons*, this language impresses payments made to Amoroso with an express trust."

Amoroso's argument conflates progress payments with retention. Funds held as retention are not "amount[s] paid to [Amoroso]." Unlike progress payments, which are payments made to the contractor as the work progresses, retention is money *withheld* from payment to a contractor, who is not entitled to receive it until he has successfully completed the project. *Harsco* and *Alturas School District*, discussed above, unequivocally reject the argument that contractors or subcontractors have any right in retention funds prior to final completion of the project, as does *Westamerica*.

### III. *Costs and Attorney Fees*

As the District notes in its reply brief, it is entitled to its costs on appeal by operation of California Rules of Court, rule 8.278(a). The District also requests "an Order awarding the District's fees in defending this appeal," citing California Rules of Court, rules 8.276(a) and 8.278(d)(2). The latter rule simply states that an award of costs does not preclude a party from seeking an award of attorney fees under rule 3.1702 in the trial court. The former rule concerns attorney fees awarded as a sanction "[o]n motion of a party or [the Court of Appeal's] own motion." Here the District has not filed a motion for sanctions and we decline to impose sanctions on our own motion.

23

## DISPOSITION

The order of the trial court denying Amoroso's motion for a preliminary injunction is affirmed.

_____
STEWART, J.

We concur.

_____
KLINE, P.J.

_____
RICHMAN, J.

24

Trial Court:                           Contra Costa County Superior Court

Trial Judge:                          Hon. Judith Craddick

Counsel for Defendant and Appellant:    Leonidou & Rosin
Janette G. Rosin
A. Robert Rosin
David L. Ashby

Counsel for Plaintiff and Respondent:   Fagen Friedman & Fulfrost, LLP
Roy A. Combs
Mark S. Williams
Cynthia M. Smith
David Mishook