[Nos. F060219, F060727. Fifth Dist. Oct. 6, 2011.]

GREG OPINSKI CONSTRUCTION, INC., et al., Cross-complainants, Cross-defendants and Appellants, v. CITY OF OAKDALE, Cross-defendant, Cross-complainant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.B., C., II., III., and V. of the Discussion.

**COUNSEL**

Cassinat Law Corporation and John E. Cassinat for Cross-complainants, Cross-defendants and Appellants.

Costanzo & Associates and Neal E. Costanzo for Cross-defendant, Cross-complainant and Respondent.

**OPINION**

**WISEMAN, Acting P. J.**—After a bench trial in this dispute between the City of Oakdale (city) and its general contractor on a building project, Greg Opinski Construction, Inc. (Opinski), the trial court awarded the city $54,000 in liquidated damages for late completion, $3,266 for repair of construction defects, prejudgment interest, and $97,775 in attorneys' fees. The claims in a cross-complaint by Opinski and its performance bond surety, Fidelity and Deposit Company of Maryland, were rejected.

██ In its statement of decision, the trial court stated that it would not consider whether the late completion was caused by actions of the city. This was because the contract required any extension of time to be obtained through certain procedures, procedures Opinski did not use, so the question of fault for the delays did not arise. Opinski argues that, in so ruling, the trial court contravened the rule laid down by our Supreme Court in *Peter Kiewit Sons' Co. v. Pasadena City Junior College Dist.* (1963) 59 Cal.2d 241 [28 Cal.Rptr. 714, 379 P.2d 18] (*Peter Kiewit*). There the court held that an owner is not entitled to damages for late completion if the lateness was caused by the owner's conduct, even if the contract barred extensions of time unless requested under specified procedures and the contractor admittedly did not make a request.

In the published part of our opinion, we hold that this aspect of *Peter Kiewit* was superseded by a 1965 amendment to Civil Code section 1511, which allows parties to specify in a contract that a party intending to avoid the effect of its failure to perform by asserting that the other party's act caused the failure must give written notice of this intention within a reasonable time. In this case, the contractual provisions requiring certain procedures to be followed by a party requesting an extension of time

amounted to the type of specification contemplated by the amendment to Civil Code section 1511. Since Opinski did not follow those procedures to claim an extension of time, it cannot rely on *Peter Kiewit*, and the trial court was correct to enforce the procedural requirements of the contract.

We also hold in the published part of our opinion that the court erred when it awarded prejudgment interest to the city. The city was holding retention funds in an escrow account created pursuant to Public Contract Code section 22300, in an amount that exceeded the damages upon which interest was awarded. The city was entitled to access the funds when it determined that Opinski had breached the contract. It had dominion and control of the funds from that point and therefore was not entitled to prejudgment interest.

The trial court ordered the retention funds in the escrow account to be used as a setoff against the judgment. With the interest included, the award consumed the entire escrow balance. The reversal of the interest award will mean that the escrow funds exceed the total amount awarded to the city. We remand so the trial court can modify the judgment to require the city to pay the residue to Opinski.

In the unpublished part of the opinion, we reject the remainder of Opinski's and the surety's arguments in these two appeals ·(cases Nos. F060219 & F060727).

### *FACTUAL AND PROCEDURAL HISTORIES*

On May 3, 2004, Opinski entered into a contract with the city as the general contractor for the project. The city issued a "Notice to Proceed" effective the same day. The contract required the work to be completed within 300 calendar days and provided for liquidated damages of $250 for each day of delay. The 300th day was February 26, 2005, but, according to the architect's certification of substantial completion, the project was not substantially complete until September 30, 2005, more than seven months late.

The litigation began when a subcontractor sued Opinski for withholding payment. The subcontractor's claim was dismissed before trial and is not now at issue. Opinski cross-complained against the city for breach of contract. The city answered and cross-complained against Opinski and the surety, also for breach of contract.

Opinski's claim against the city was that the city wrongfully refused to pay a balance of $164,839 of the contract price plus $24,436 in excess of the contract price for proposed change orders the city had refused to approve,

along with interest and contractual penalties. The $164,839 balance represented an unpaid portion of the "retention" funds. In a construction contract, a retention is a portion of the contract price that is withheld by the owner as a form of security in case of a dispute. "Authorities have noted that a retention occurs when the owner retains a percentage from each progress payment as a form of security against potential mechanics' liens and as security that· the contractor will complete the work properly and repair defects." (*Yassin v. Solis* (2010) 184 Cal.App.4th 524, 534 [108 Cal.Rptr.3d 854].) The contract in this case provided for a retention of 10 percent of the contract price. As the progress payments came due, the retention funds were deposited in an escrow account the parties established for that purpose.

The city's claim against Opinski was that Opinski owed $54,000 in liquidated damages for lateness, $10,000 for defective conditions, and interest. The city also claimed that it was withholding the balance of the contract price in escrow because it had received stop notices from three subcontractors. Stop notices are notices from subcontractors stating that the city should not pay the general contractor an amount the general contractor had failed to pay the subcontractor.

The city did not, however, argue that the stop notices ultimately meant the amount to be paid to Opinski should be reduced. In its posttrial brief, the city suggested that the court should award the city judgment against Opinski for the damages for lateness and defects, but should also direct the city to authorize the release of the funds in escrow to Opinski. Then, according to the city, Opinski should be ordered to pay the amounts at issue in the stop notices to the subcontractors.

The key provisions of the contract for purposes of these appeals concerned the means by which the contract price and the contract time (i.e., the time by which the project was to be completed) could be changed. The parties could only be bound by changes in the completion time or the price that were made in writing through specified procedures. These procedures were included in a lengthy set of provisions called the "General Conditions of the Contract." Paragraphs 11.2 and 12.1 of the general conditions provided that the completion time and the contract price could be changed only by means of a change order. A change order was defined as a document signed by the contractor and the city that authorized a change in the price, time, or other provision of the contract.

Paragraph 11.2 provided that "[n]o claim for an adjustment in the Contract Price will be valid if not submitted in accordance with this paragraph 11.2." Paragraph 12.1 included a similar provision about claims for adjustment to the contract time.

A change order altering the time or price could be executed by either of two routes. First, under paragraph 10.4.2, the parties could execute the order by mutual agreement. Second, under paragraph 10.4.3, an order could be issued to "embody the substance of any written decision rendered by Engineer pursuant to paragraph 9.11 . . . ." The engineer was defined as "[t]he person, firm or corporation which prepared the Plans and Contract Documents." The engineer for this project was the firm RRM Design Group.[1] Paragraph 10.4 provided that "Owner and Contractor shall execute appropriate Change Orders" covering changes to the time or price arrived at in one of these ways.

Paragraph 9.11 provided a process by which the engineer could be asked to rule on claims by the parties for changes in the time or price. "[C]laims under Articles 11 and 12 in respect [to] changes in the Contract Price or Contract Time" were to be "referred initially to Engineer in writing with a request for a formal decision . . . ." The party making the claim was required to give written notice of the claim to the engineer and to the other party "promptly (but in no event later than thirty days) after the occurrence of the event giving rise thereto . . . ." Data supporting the claim were required to be submitted "within sixty days after such occurrence" unless the engineer allowed additional time. After this, the engineer was to render a decision in writing within a reasonable time.

Paragraph 12.2 specified that an extension of time based on circumstances beyond the control of the contractor was to be granted after submission of a claim: "The Contract Time will be extended in an amount equal to time lost due to delays beyond the control of the Contractor if a claim is made [therefor] as provided in paragraph 12.1. Such delays shall include, but not be limited to, acts of neglect by Owner or others performing additional work as contemplated by Article 7, or to fires, floods, labor disputes, epidemics, abnormal weather conditions or acts of God." .

The court issued a written ruling after a bench trial. It awarded the city $54,000 plus interest for lateness and $3,266 for repair of construction defects. It found that the city rightly withheld $43,546 for two stop notices, and that Opinski "failed to meet its burden of proof that it bonded around the two . . . stop notices . . . ." It further found that the city's decision to withhold over $164,000 of the contract price was "not unreasonable" because, under Public Contract Code section 7107, subdivision (c),[2] the city was entitled to

---

[1] RRM Design Group provided architectural and engineering services. One of its principals, Kirk Van Cleave, signed the certificate of substantial completion as architect.

[2] The subdivision provides: "In the event of a dispute between the public entity and the original contractor, the public entity may withhold from the final payment an amount not to exceed 150 percent of the disputed amount." (Pub. Contract Code, § 7107, subd. (c).)

withhold up to 150 percent of the amount in dispute. The amount in dispute was $54,000, plus $43,546, plus a then unknown amount for defects. The ruling rejected Opinski's claims for unpaid change orders, stating that Opinski failed to submit them within 30 days as required by the contract. Finally, the ruling directed the city to prepare a proposed statement of decision and judgment.

The ruling did not state that either Opinski or the city was required to pay any of the withheld money to subcontractors and did not state that the contract price was reduced by the amount of the notices or any other amount. It did not include any statement about the disposal of the money in the escrow account.

These omissions led to a dispute over the contents of the proposed statement of decision and judgment. Opinski submitted a request for a statement of decision asking for, among other things, rulings on whether the city was required to release the funds in escrow and whether Opinski was entitled to a judgment in the amount of the difference between the escrow balance and the judgment in favor of the city.

The city prepared, and the court signed and filed, a statement of decision that included a set of responses to the issues raised in Opinski's request. The responses included a determination that there was no need to answer Opinski's requests for findings about the causes of the delay in completion. It was "not necessary to separately respond to each of these requests" because, under the circumstances, the terms of the contract made the answers irrelevant. To alter the contract time—regardless of the reason—the contract required the party seeking the alteration to obtain a change order either by mutual agreement or by submitting a claim to the engineer with a request for a formal decision in writing. Neither procedure was used, the court reasoned, so the time was not extended, regardless of which party was to blame for the late completion.

The responses to Opinski's requests also included the following three reasons why Opinski was not entitled to a judgment for the difference between the escrow balance and the judgment for the city and why no order for the disposition of the escrow funds was called for:

"First, these requests assume that the City is unilaterally withholding and can unilaterally release $164,839 in retention funds. In fact, the money representing the retention funds is deposited and held pursuant to an escrow agreement . . . . The money held in escrow can only be released with the consent of both parties. It cannot be . . . unilaterally released, or accessed, by either party. The court's finding is that since the City could 'retrieve up to

150% per PCC §7107,' . . . the 'retention is not unreasonable.' That the principal sum of the judgment to be entered is less than the amount now held in the escrow account provides no legal or factual basis for an entry of judgment in favor of [Opinski or the surety]. Any issues that remain between the parties following .entry of judgment in this action, which is premised solely upon alleged breaches of the construction agreement, are not within the subject matter of the issues framed by the pleadings in this case.

"Second, a judgment in favor of Opinski or its surety would necessarily need to be premised upon a breach of the construction contract by the City. Here, the court has found no such breach by the City but has determined that there is a breach of the contract by Opinski. . . . Thus, there is no legal or factual basis that could support the entry of any judgment in favor of either Opinski or its surety.

"Finally, and as noted, the City is entitled to effectively stop payment of 150% of the amount in dispute under PCC §7107. The presumptive reason for the legislative right to maintain a retention in that amount in the event of a dispute necessarily contemplates, as [do] the terms of the construction agreement, that the City will recover costs and attorneys fees in connection with any dispute arising out of the construction agreement. Accordingly, the court concludes that the City of Oakdale is not required to release for payment to Opinski [the amount of the difference between the escrow balance and the amount of the judgment for the city]; that Opinski is not entitled to a judgment on its cross-complaint in that amount or in any amount; and is not entitled to a net judgment in that amount, or any amount."

The court entered judgment for the city and against Opinski and the surety on February 3, 2010, stating that attorneys' fees would be determined later by motion. A motion for a new trial and a number of other motions were denied. In its order denying the new trial motion, the court stated that it was "retaining jurisdiction over the issue of the amount of retention funds that are being retained and to which Opinski is entitled to until that amount is finally determined." Opinski and the surety filed a notice of appeal, initiating the first of the two appeals (No. F060219) now before us.

The city filed its motion for attorneys' fees. Relying on article XIII of the parties' contract, the city requested $104,478.67 in attorneys' fees. On June 28, 2010, the court awarded $97,775 in fees against Opinski and ruled that no fees could be awarded against the surety. The combined amount of the damages judgment, interest, and fees now exceeded the amount of the funds retained in the escrow account. The court ruled that all the money in the escrow account would be used to satisfy a portion of the judgment. The order awarding fees stated: "During the hearing, [Opinski] asked the Court about

the status of the retention monies that are still held in escrow for this Project. After hearing from both counsel on the subject matter of the retention monies, the Court directed [city's counsel] to write to the bank holding the monies and request the release of the retention monies to the [city]. Any such monies paid to the [city] from the retention account shall, to that extent, satisfy the judgment of the [city] against [Opinski] in this action." Opinski and the surety filed the second appeal, No. F060727.

## *DISCUSSION*

I. *Liquidated damages for late completion*

 A. *Court's reliance on contractual requirements for extension*

Opinski argues that it was error to award liquidated damages for lateness on the ground that if no extension was requested or granted through the required procedures, then it did not matter which party, if either, was to blame for the delays, since the contract barred extensions of time for any reason except pursuant to those procedures. Relying on *Peter Kiewit, supra,* 59 Cal.2d 241 and on Civil Code section 1511, Opinski contends that liquidated damages could not be awarded for any portion of the delay that was caused by the city, even if Opinski failed to use the contract's procedures for obtaining an extension. Opinski says its timely performance was impossible because of the city-caused delays.

In *Peter Kiewit,* the California Supreme Court rejected an analysis like the one the trial court employed here. The contract at issue had similar provisions. The court stated: "The principal question presented concerns the effect, if any, to be given to a provision of the contract that, if the work was not completed within the time specified (300 days after notice to start work), the sum of $25 was to be deducted from the final payment as liquidated damages for each day's delay after the expiration of that period until final acceptance by defendant [junior college district]. The agreement also provided that, if plaintiff [contractor] considered itself entitled to an extension of time for any cause, it must submit in writing to the architect and defendant an application for such extension. Extensions were to be granted only for delays resulting from causes beyond plaintiff's control, including, among other things, strikes, alterations of the work delaying completion, and 'any act of neglect, duty, or default' of defendant." (*Peter Kiewit, supra,* 59 Cal.2d at p. 243.)

The work was not completed on time, but the trial court found that the lateness was caused by matters beyond the contractor's control. The government agency conceded that its own conduct caused the delays. The contractor

did not request extensions of time in connection with those delays in accordance with the required procedures. (*Peter Kiewit, supra*, 59 Cal.2d at p. 243.)

The Supreme Court rejected the government agency's contention that the trial court should have enforced the contract's requirements for extending time and should have awarded the agency liquidated damages even though the agency caused the delays itself. It held, "Noncompliance with a provision requiring an application for an extension of time is not a proper basis for holding a contractor liable in liquidated damages for late completion caused by the owner's conduct." (*Peter Kiewit, supra*, 59 Cal.2d at p. 245.) The court relied on Civil Code section 1511, which provides in part:

"The want of performance of an obligation, or of an offer of performance, in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate:

"1. When such performance or offer is prevented or delayed by the act of the creditor, or by the operation of law, even though there may have been a stipulation that this shall not be an excuse . . . ." (Civ. Code, § 1511; see also Review of Selected 1965 Code Legislation (Cont.Ed.Bar 1965) p. 55.) Chief Justice Gibson's opinion explained: "Section 1511 of the Civil Code provides in subdivision 1 that any delay in the performance of an obligation 'is excused' when performance is delayed by 'the act of the creditor . . . *even though there may have been a stipulation that this shall not be an excuse.*' (Italics added.) An owner who is a party to a construction contract is a creditor within the meaning of section 1511 [citation], and, as the italicized portion of the section makes clear, a provision in an agreement that the contractor is not to be excused for late completion caused by the owner is rendered inoperative by the statute. A provision in a contract which would require the contractor to make an application for an extension of time before he may be excused for a delay caused by the owner's conduct would obviously constitute a substantial limitation on the policy declared by section 1511." (*Peter Kiewit, supra*, 59 Cal.2d at pp. 243–244.)

The *Peter Kiewit* decision was criticized as an unwarranted interference in the power of contracting parties to shift the risk of delays caused by one party onto the other party by forcing the second party to give the first notice of any intention to claim an extension of time based on delays caused by the first. A Boalt Hall professor thundered: "Almost universally, building contracts contain a provision that conditions the contractor's right to claim an extension of time for delays beyond his control upon giving written notice of his intention to make such a claim. Despite contrary precedents, a unanimous California Supreme Court gutted this sensible provision in [*Peter Kiewit*]. A questionable

application of an obscure provision of California Civil Code Section 1511 was employed to justify the court's refusal to give effect to this express condition. This decision will undoubtedly hamper fair and effective administration of California construction contracts and should not pass unnoticed by the Bar." (Sweet, *Extensions of Time and Conditions of Notice: California's Needless Restriction of Contractual Freedom* (1963) 51 Cal. L.Rev. 720, 720, fns. omitted.)

In 1965, the Legislature amended section 1511, subdivision 1, to add the following clause after "shall not be an excuse": "however, the parties may expressly require in a contract that the party relying on the provisions of this paragraph give written notice to the other party or parties, within a reasonable time after the occurrence of the event excusing performance, of an intention to claim an extension of time or of an intention to bring suit or of any other similar or related intent, provided the requirement of such notice is reasonable and just . . . ." (Civ. Code, § 1511; see also Stats. 1965, ch. 1730, § 1, pp. 3887–3888; *General Insurance Co. v. Commerce Hyatt House* (1970) 5 Cal.App.3d 460, 470–471 [85 Cal.Rptr. 317].)

The amendment was a legislative reaction against the *Peter Kiewit* decision. A Continuing Education of the Bar publication issued at the time explained:

"Formerly, § 1511(1) prevented a contract obligor from contracting to assume to risk of delays or barriers to performance caused by the obligee. Obstructive conduct by the obligee was always an excuse for nonperformance, even if the obligor had accepted a stipulation that this conduct would not be an excuse.

"Many contracts include a provision whereby the obligor is required to give notice of his intention to claim that failure of performance has been excused by the obligee's conduct. Failure to give timely notice is made a waiver of the excuse. [Citations.] However, these notice requirements have been held contrary to the policy of § 1511(1) and hence void. [*Peter Kiewit, supra*], followed in *Aetna Cas. & Sur. Co. v. Board of Trustees* (1963) 223 CA2d 337; see 1 Witkin, Summary, 1963 Supp., Contracts § 252.

"Amended § 1511(1) overcomes the court holding and restores the power of contracting parties to include in their contract a provision requiring the obligor to give notice if he intends to rely on obligee's conduct as an excuse for delay or nonperformance, or as a basis for damages or other affirmative relief." (Review of Selected 1965 Code Legislation, *supra*, at pp. 55–56.)

The contract in this case contained provisions of the type contemplated by the 1965 amendment. If the contractor wished to claim it needed an extension

of time because of delays caused by the city, the contractor was required to obtain a written change order by mutual consent or submit a claim in writing requesting a formal decision by the engineer. It did neither. The court was correct to rely on its failure and enforce the terms of the contract. It makes no difference whether Opinski's timely performance was possible or impossible under these circumstances. The purpose of contract provisions of the type authorized by the 1965 amendment to Civil Code section 1511, subdivision 1, is to allocate to the contractor the risk of delay costs—even for delays beyond the contractor's control—unless the contractor follows the required procedures for notifying the owner of its intent to claim a right to an extension. There was no error.

Besides *Peter Kiewit*, Opinski also cites *Aetna Cas. etc. Co. v. Bd. of Trustees, supra*, 223 Cal.App.2d 337 and *General Insurance Co. v. Commerce Hyatt House, supra*, 5 Cal.App.3d 460, but both of those cases apply the law as it was before the 1965 amendment. *General Ins. Co. of America* was decided after the amendment, but the court explained that the preamendment law applied because the contract was made before 1965. (*General Insurance Co., supra*, at p. 471.)

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV. *Interest*

Opinski argues that the court should not have awarded prejudgment interest to the city because the city was withholding the money the court ultimately awarded to it. Opinski contends that this means the city had the use of that money. Since the purpose of awarding prejudgment interest is to compensate the injured party for the time value of money it recovers, interest should not be awarded where that party was in possession of the money all along, Opinski says.

The city argues that "[i]t is simply not the case that [it] ever had the ability to access" the retention funds in the escrow account. It claims the escrow agreement did not allow one party to withdraw the funds without the consent of the other party.

---

*See footnote, *ante*, page 1107.

■ The rule is that if, during any prejudgment period, a party has dominion and control over money that is awarded to it as damages, it is not entitled to prejudgment interest for that period. In *Buckman v. Tucker* (1937) 9 Cal.2d 403 [71 P.2d 69], Thompson sued Buckman for $439.72 upon a contract and prevailed at trial. Buckman appealed but did not file a stay bond. Thompson secured a writ of execution and collected on February 18, 1935. The appeal led to a new trial, the result of which was a determination that, under the parties' agreement, the suit had been brought prematurely because the debt had not yet matured. (*Id.* at p. 404.)

After the maturation date, Buckman sued and prevailed again. The trial court awarded prejudgment interest from July 16, 1934, to October 29, 1935. (*Buckman v. Tucker, supra*, 9 Cal.2d at p. 405.) The Supreme Court held that the interest award was erroneous because Buckman had obtained the money on February 18, 1935: "Defendant Thompson had execution issued on February 18, 1935. It is obvious from the date that the defendant thus came into possession of the money that he had dominion and control thereof, and interest should have terminated on that date." (*Id.* at p. 409; see also *Insurance Co. of North America v. Bechtel* (1973) 36 Cal.App.3d 310, 319 [111 Cal.Rptr. 507] [prejudgment interest on judgment against insurer should have terminated on date when insurer deposited funds with court and parties stipulated that funds would be released to insured without prejudice].) The question, therefore, is whether the city had dominion and control over the money in the escrow account. This, in turn, depends on the terms of the parties' escrow agreement.

■ The parties' escrow agreement conforms to the model agreement in Public Contract Code section 22300, subdivision (f). The purpose of an escrow agreement under Public Contract Code section 22300 is to allow the contractor to receive in cash the money that would otherwise be held by the owner as retention, while providing the owner with securities as collateral: "At the request and expense of the contractor, securities equivalent to the amount withheld [as retention] shall be deposited with the public agency, or with a state or federally chartered bank in this state as the escrow agent, who shall then pay those moneys to the contractor. Upon satisfactory completion of the contract, the securities shall be returned to the contractor." (Pub. Contract Code, § 22300, subd. (a).) In effect, the agreement allows the contractor to borrow against the securities. As an alternative, the contractor can request that the owner pay the retentions in cash to the escrow agent. In that case, the contractor "may direct the investment of the payments into securities," and interest earned on the investments belongs to the contractor. (Pub. Contract Code, § 22300, subd. (b).)

Like the model agreement in the statute, the parties' escrow agreement provides in paragraph 7 that the owner is entitled to convert the securities to

cash and withdraw the cash "in the event of default by the Contractor." (Pub. Contract Code, § 22300, subd. (f)(7).) Neither the model agreement nor the parties' agreement explains what happens if the contractor defaults and the escrow account already contains only cash, as appears to have happened in this case.

Opinski argues that paragraph 7 implies that, in case of breach by the contractor, the owner is entitled to withdraw the principal in the escrow account regardless of its form. The city argues that two other provisions, paragraphs 3 and 6, imply that, once funds are placed in the escrow account, they cannot be withdrawn without the consent of both parties. Paragraph 3 provides that when the owner makes cash retention payments into the escrow account, "the Escrow Agent shall hold them for the benefit of the Contractor until the time that the escrow created under this contract is terminated." Paragraph 6 states that "Contractor shall have the right to withdraw all or any part of the principal in the Escrow Account only by written notice to Escrow Agent accompanied by written authorization from the Owner to the Escrow Agent that Owner consents to the withdrawal of the amount sought to be withdrawn by Contractor."

█ We agree with Opinski. The purpose of the practice of withholding retention payments is to give the owner security in case of breach by the contractor. Nothing in Public Contract Code section 22300 evinces a legislative intent to limit an owner's recourse. Although paragraph 7 of the model escrow agreement (and the parties' actual escrow agreement) does not expressly state that an owner can withdraw cash if the contractor defaults and the account never contained securities, the inclusion of that paragraph presupposes that the owner has a right to possession of the retention when the owner deems the contractor to be in breach. The purpose of withholding retention would be undermined if this were not the case, and there is no reason why the form of the retention—securities or cash—would make a difference in this regard. For these reasons, we conclude that the city had the power to withdraw the money from the escrow account when it determined that Opinski had breached the contract. Therefore, it had dominion and control over the money from the time of the breach and was not entitled to prejudgment interest.

The court's order in its ruling on the attorneys' fees motion is consistent with this view.[6] It directed the city to "write to the bank holding the monies and request the release of the retention monies to" the city. The court did not direct Opinski to give consent. The record does not show, and the city does

---

[6] Its statement of decision in support of the February 1, 2010 judgment, however, was not consistent with this view. The court opined that the city could not have accessed the money without Opinski's consent. We reject this position, as we have said.

not claim, that it turned out to be impossible to release the money to the city on the city's sole authorization.

The city's reliance on paragraphs 3 and 6 of the escrow agreement is misplaced. Paragraph 3 states that the escrow agent "shall hold" retention payments "for the benefit of the Contractor" until the escrow is terminated, but this cannot mean the owner lacks power to direct the escrow agent to return the principal if the contractor breaches, since paragraph 3 would in that case conflict with paragraph 7. Paragraph 3 would also conflict with the basic purpose of retention under that interpretation, for it would deprive the owner of security against the contractor's breach. Paragraph 6 says only that the contractor cannot withdraw funds without the consent of the owner. The omission of the converse provision—that the owner cannot withdraw funds without the consent of the contractor—shows that the converse provision is not intended. Further, once again, the purpose of retention—to provide security to the owner—would be defeated if the placement of retention in escrow meant the money was inaccessible to the owner absent the consent of the contractor.

We conclude the award of prejudgment interest to the city was error and reverse the award. The effect of the reversal is that the escrow balance will exceed the total award to the city. The escrow balance is sometimes stated in the record as $164,839 and sometimes as $164,781. Without prejudgment interest, the total award to the city is $54,000 for late completion, $3,266 for repair of construction defects, and $97,775 for attorneys' fees, a total of $155,041.

■ The difference between the escrow balance (whichever it is) and the city's recovery must be awarded to Opinski on remand. We agree with the *Fassberg* court that, where there is no remaining dispute to justify continued withholding of retention, the owner must release any retention funds that exceed the court's award to the owner, and the court should order the owner to do so. (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 764 [60 Cal.Rptr.3d 375].) The trial court's assertion in the statement of decision that the question of a release of retention funds to Opinski was not within the issues framed by the pleadings is inconsistent with the holding in *Fassberg* that no special procedures are needed to "invoke the equitable power of the court to effect a setoff, when appropriate." (*Id.* at p. 763.)

V. *Surety's claims*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

\*See footnote, *ante*, page 1107.

## *DISPOSITION*

The award of prejudgment interest in No. F060219 is reversed. No. F060727 is remanded to the trial court with directions to determine the amount by which the total award in both matters is exceeded by the amount that was retained in escrow and to order the city to pay Opinski the difference. The judgments are affirmed in all other respects. The parties shall bear their own costs on appeal.

Levy, J., and Kane, J., concurred.

The petition of cross-complainants, cross-defendants and appellants for review by the Supreme Court was denied January 18, 2012, S197927.