Filed 5/1/25  Pacific Western Bank v. Stronghold Engineering CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PACIFIC WESTERN BANK, | |
| Plaintiff, | G064672 |
| v. | (Super. Ct. No. CIVSB2212212) |
| STRONGHOLD ENGINEERING, INC., | O P I N I O N |
| Defendant and Appellant, | |
| and | |
| CITY OF MONTEREY, | |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Donald R. Alvarez, Judge. Affirmed. Request for judicial notice granted.

No appearance by Plaintiff Pacific Western Bank.

Stream Kim Hicks Wrage & Alfaro, Theodore K. Stream and Donna M. DiCarlantonio; Gibson, Dunn & Crutcher, Blaine Evanson and Matt Aidan Getz for Defendant and Appellant Stronghold Engineering, Inc.

Colantuono, Highsmith & Whatley, Michael G. Colantuono and Meghan A. Wharton for Defendant and Respondent City of Monterey.

\*     \*     \*

Stronghold Engineering, Inc. (Stronghold) and the City of Monterey (City) entered into a public works construction contract. As permitted by Public Contract Code section 22300,[1] Stronghold opted for escrow of security deposits rather than traditional earnings retention. Stronghold and the City signed an Escrow Agreement for Security Deposits in Lieu of Retention (escrow agreement) consistent with the form agreement in the statute. (§ 22300, subd. (g).) The escrow account was opened at California United Bank, which became Pacific Western Bank following a merger (Bank), and the Bank was the escrow agent.

Later, the City sought distribution of the funds in the escrow account (over $2.5 million), and in a letter to the Bank, Stronghold opposed the release of the funds to the City. The Bank filed an interpleader complaint naming the City and Stronghold as defendants. The trial court sustained the City's demurrer, relying on *Westamerica Bank v. City of Berkeley* (2011) 201 Cal.App.4th 598 (*Westamerica*). The court ordered the funds, which the Bank had placed with the court clerk, be disbursed to the City unless Stronghold appealed.

---

[1] Undesignated statutory references are to the Public Contract Code.

Stronghold contends the trial court erred by relying on *Westamerica.* Essentially, Stronghold urges this court to disagree with *Westamerica* or find it distinguishable. We decline the request. We conclude *Westamerica* is persuasive and any distinctions between it and this matter do not compel a different result.

BACKGROUND

I.

PUBLIC CONSTRUCTION CONTRACTS AND SECTIONS 22300 AND 7107

A brief explanation concerning retention funds and security deposits in construction contracts, as well as sections 22300 and 7107, provides a useful backdrop for the history of this case and analysis of the appellate issue.

"'[I]t is common for construction contracts to contain terms that protect an owner's construction funds. Owners and contractors generally structure their contracts to provide for installment payments to the contractor as the work progresses, typically as the work reaches specified stages of completion. [Citation.] "This payment system adds incentive for the contractor to complete the work and reduces the risk of nonperformance for the owner. A percentage of funds held until completion of all of the work is called retainage and is intended both to reduce the risk of nonperformance by the contractor and to assure the completion of the work in accordance with the contract terms."' [Citation.] If the contractor defaults on the construction contract 'then the owner is entitled to use the retained funds to complete the contract. In fact, this is one of the primary reasons for which the owner insists on retainage in the first place.'" (*Pittsburg Unified School Dist. v. S.J. Amoroso Construction Co., Inc.* (2014) 232 Cal.App.4th 808, 814 (*Pittsburg*); accord, *United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4

3

Cal.5th 1082, 1087–1088 [progress payments in construction contracts build incentive for contractors to complete work and provide owner some protection against nonperformance]; *Westamerica, supra*, 201 Cal.App.4th at p. 610 ["retained earnings serve as an incentive for timely completion of the contract"]; *Greg Opinski Construction, Inc. v. City of Oakdale* (2011) 199 Cal.App.4th 1107, 1120 (*Opinski*) ["[t]he purpose of . . . withholding retention payments is to give the owner security in case of breach by the contractor"].)

"By law, there is an alternative to the withholding of retention funds. A contractor on a public works project may elect to deposit into an escrow account securities equivalent in value to the amount that would have been retained by the owner. (Pub. Contract Code, § 22300.) If the contractor does so, it is entitled to receive the full amount of each progress payment, and no funds are withheld for the retainage. [Citation.] Thus, the securities held in escrow are, in purpose and effect, the retained earnings of the contractor held by the public entity/owner against the risk of nonperformance by the contractor, except the funds are actually held by an escrow agent in the name of the owner. [Citation.] The purpose of allowing escrowed securities in lieu of retentions is to permit the contractor, rather than the owner, to earn interest on the retention." (*Westamerica, supra*, 201 Cal.App.4th at p. 602, fn. omitted; *Pittsburg, supra*, 232 Cal.App.4th at p. 815.)

Section 22300, subdivision (g) mandates the terms of the escrow agreement. The form agreement in the statute provides, among other things, the public entity owner agrees, to the extent there are securities in the escrow account equal in value to the retention amounts that would otherwise be withheld, not to withhold retention from progress payments. (§ 22300, subd. (g)(2).) It also provides: "The Owner shall have a right to draw upon the securities in the event of default by the Contractor. Upon seven days[ ]

4

written notice to the Escrow Agent from the owner of the default, the Escrow Agent shall immediately convert the securities to cash and shall distribute the cash as instructed by the Owner." (*Id.*, subd. (g)(7).)

If "an owner wrongfully withholds the retained earnings from a contractor, section 7107 grants special remedies. Subdivision (c) of that statute provides that the retention withheld by the public entity/owner must be released to the contractor within 60 days after completion of the work. [(§ 7107, subd. (c).)] The statute also provides that if the retention is not released within the time prescribed, 'the public entity . . . shall be subject to a charge of 2 percent per month on the improperly withheld amount, in lieu of any interest otherwise due[, and] in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to attorney's fees and costs.' (§ 7107, subd. (f).) The owner is thus subject to statutory penalties if it refuses to release the retention in a timely fashion, but if there is a dispute between the owner and the contractor concerning the work, the owner may withhold up to 150 percent of the disputed amount beyond the prescribed period. (§ 7107, subd. (e).)" (*Westamerica, supra*, 201 Cal.App.4th at p. 602; accord, *Pittsburg, supra*, 232 Cal.App.4th at pp. 814–815.)

## II.

### THE ESCROW AGREEMENT

In connection with the construction contract between Stronghold and the City, Stronghold elected to take advantage of section 22300. In 2016, the City, Stronghold, and the Bank entered into an escrow agreement. The terms of the escrow agreement provided the City was the "'Owner,'" Stronghold the "'Contractor,'" and the Bank the "'Escrow Agent.'" The escrow agreement was consistent with and tracked the language in section 22300, subdivision (g).

5

Paragraph one of the escrow agreement stated Stronghold had the option to either deposit securities with the Bank as a substitute for retention earnings required to be withheld by the City pursuant to their construction contract or, on Stronghold's written request, to require the City to make payments of the retention earnings directly to the Bank. It also provided the securities would be held in the name of the City and Stronghold would be designated the beneficial owner.

As relevant to the issues on appeal, the escrow agreement included the following additional paragraphs:

"(5) The interest earned on the securities or the money market accounts held in escrow and all interest earned on that interest shall be for the sole account of [Stronghold] and shall be subject to withdrawal by [Stronghold] at any time and from time to time without notice to the [City].

"(6) [Stronghold] shall have the right to withdraw all or any part of the principal in the Escrow Account only by written notice to Escrow Agent accompanied by written authorization from the [City] to the Escrow Agent that [the City] consents to the withdrawal of the amount sought to be withdrawn by [Stronghold].

"(7) *The [City] shall have a right to draw upon the securities in the event of default by [Stronghold]. Upon seven days[ ] written notice to the Escrow Agent from the [City] of the default, the Escrow Agent shall immediately convert the securities to cash and shall distribute the cash as instructed by the [City].*

"(8) Upon receipt of written notification from the [City] certifying that the Contract is final and complete, and that [Stronghold] has complied with all requirements and procedures applicable to the Contract, Escrow Agent shall release to [Stronghold] all securities and interest on deposit less

6

escrow fees and charges of the Escrow Account. The escrow shall be closed immediately upon disbursement of all moneys and securities on deposit and payments of fees and charges.

"(9) Escrow Agent shall rely on the written notifications from the [City] and [Stronghold] pursuant to Sections (5) to (8), inclusive, of this Agreement and the [City] and [Stronghold] shall hold Escrow Agent harmless from Escrow Agent's release and disbursement of the securities and interest as set forth above." (Italics added.)

## III.

### LITIGATION BETWEEN STRONGHOLD AND THE CITY

During the construction, disputes arose between Stronghold and the City. In December 2016, Stronghold sought declaratory relief in an action against the City concerning the construction contract. (*Stronghold Engineering Inc. v. City of Monterey* (2023) 96 Cal.App.5th 1203, 1207.) After "multiple procedural turns," Stronghold filed a fourth amended complaint in October 2019 in Santa Clara County, adding three causes of action to its prior pleading seeking declaratory relief, including the City: (1) breached the project contract, (2) breached the renovation contract, and (3) violated the Public Contract Code by not promptly paying Stronghold for work. (*Stronghold, supra*, at p. 1207.) As to this last claim, Stronghold alleged, inter alia, the City violated section 7107 by failing to pay Stronghold its retention funds within 60 days of completion of the project. In December 2019, the City filed an answer to the fourth amended complaint, asserting several affirmative defenses, including "set-off" and default.[2]

---

[2] We grant the City's request for judicial notice as to the existence of its answer. (Evid. Code § 452, subd. (d); *People v. Franklin* (2016) 63 Cal.4th 261, 280 [court may take judicial notice of existence of document

In January 2021, the City filed its second amended cross-complaint against Stronghold but dismissed it without prejudice in May 2022. The superior court granted the City's motion for summary judgment, and Stronghold appealed.[3]

IV.

THE CITY SEEKS THE FUNDS IN THE ESCROW ACCOUNT

On July 25, 2022, the City sent the Bank a letter stating Stronghold had defaulted on its contract with the City and pursuant to the escrow agreement, "paragraph (7)," the City was exercising "its right to draw upon the securities held in escrow by" the Bank. The letter stated it constituted the required written notice and triggered the seven-day period for the Bank to convert the securities to cash and distribute it to the City.

Two days later, attorneys for Stronghold sent the Bank a letter disputing the City's claim Stronghold was in default. Stronghold stated it had completed the work in 2018 and had made a claim against the City for unpaid amounts, which was on appeal. In the letter, Stronghold asserted the City's claim to the funds in the escrow account was not in good faith and Stronghold requested the entire balance remain in the account pending litigation. Stronghold contended "the Bank's release of these escrowed funds earned by Stronghold to the City without court approval would, in fact, breach the Bank's fiduciary duty to Stronghold."

in court file but can only take judicial notice of the truth of facts asserted in certain documents such as ""orders, findings of fact and conclusions of law, and judgments""].)

[3] In *Stronghold, supra*, 96 Cal.App.5th 1203, the Sixth District Court of Appeal concluded the trial court erred and reversed the judgment. (*Id*. at p. 1206.) The appellate decision was filed after the trial court's ruling in this matter but prior to the issuance of the judgment.

## V.

### THE BANK FILES AN INTERPLEADER ACTION

The following month, the Bank initiated the instant action by filing a complaint in interpleader in San Bernardino County, naming the City and Stronghold as defendants. The Bank delivered to the trial court's clerk a check for $2,577,034.26, which it represented was the amount of the escrow account's funds in dispute. The City demurred to the Bank's complaint. The Bank and Stronghold separately opposed the demurrer. The trial court sustained the City's demurrer with leave to amend.

In November 2022, the Bank filed the operative first amended complaint in interpleader. The core allegations of the first amended complaint are: Stronghold sued the City in a separate lawsuit for breach of the construction contract for which the escrow account was opened. In that lawsuit, the City admitted in its cross-complaint Stronghold had completed the project but stated Stronghold was late in doing so. After the City dismissed its cross-complaint, both the City and Stronghold made conflicting demands upon the Bank as to the money in the escrow account. During the hearing on the City's demurrer to the Bank's original complaint in interpleader, counsel for the City and Stronghold's counsel each asserted the Bank would be liable to its client if the Bank released the money in the escrow agreement to the other. After that demurrer hearing, the City and Stronghold made "further demands and express threats of liability to" the Bank. The Bank alleged a dispute existed between the City and Stronghold relating to the money in the escrow account; each of them had made adverse and conflicting claims; and the Bank was "unable to safely determine, without exposure to multiple liability, whether the respective claims to the monies in the Escrow are valid." The Bank asserted it could not release the

9

money to either the City or Stronghold without the risk of a lawsuit by the other, subjecting the Bank to double vexation. The Bank requested the City and Stronghold be ordered to interplead and litigate their rights to the money, be restrained from initiating any actions against the Bank relating to the money, and the Bank be discharged from liability and dismissed from the action.

The Bank attached as exhibits to its first amended complaint: (1) the escrow agreement; (2) the aforementioned letter by the City dated July 25, 2022; (3) Stronghold's letter to the Bank dated July 27, 2022; (4) e-mails from the City's counsel threatening the Bank with litigation, including a prejudgment attachment against the Bank; and (5) a letter from Stronghold to the Bank's counsel, asserting entitlement to the escrow funds and threatening litigation against the Bank should it release the funds to the City.

The City again demurred to the complaint. Both Stronghold and the Bank filed oppositions to the demurrer. In a written order, the trial court sustained the City's demurrer to the first amended complaint without leave to amend. Explaining its reasoning, the court stated: "[T]he complaint fails to state a valid claim for interpleader because the [escrow agreement] allows the City . . . to provide notice of default and in response [the] Bank is required to convert the securities and forward the funds to the City. Since the agreement contains a hold harmless provision, there is no credible threat to the bank sufficient to support an interpleader action, just as the [C]ourt of [A]ppeal found in *Westamerica* . . . ."

Subsequently, the judgment of dismissal of the complaint in interpleader was issued. The court ordered the clerk to disburse the funds to the City within 10 days unless Stronghold filed a notice of appeal and posted

10

a bond or undertaking. Stronghold appealed and posted the requisite undertaking.

## DISCUSSION

Stronghold contends the trial court erred by sustaining the City's demurrer. We disagree.

### I.

### STANDARD OF REVIEW

"'In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.' [Citation.] ""We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . . We also consider matters which may be judicially noticed." . . . Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context."'" (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768.)

### II.

### INTERPLEADER ACTION

"A party 'against whom double or multiple claims are made,' that 'may give rise to double or multiple liability,' may bring an action against the claimants to compel them to interplead and litigate their claims. (Code Civ. Proc., § 386, subd. (b).) The complaint must show that '"the defendants make conflicting claims"' to the subject matter, and that the plaintiff '"cannot safely determine which claim is valid and offers to deposit the money in court . . . ." [Citation.]' [Citation.] But an interpleader action may not be maintained '"upon the mere pretext or suspicion of double vexation."'" (*Placer Foreclosure, Inc. v. Aflalo* (2018) 23 Cal.App.5th 1109, 1113.)

11

"""[I]nterpleader is an equitable proceeding in which the rights of the parties, as between themselves, are governed by principles of equity." [Citations.] "The purpose of interpleader is to prevent a multiplicity of suits and double vexation. [Citation.] 'The right to the remedy by interpleader is founded, however, not on the consideration that a [person] may be subjected to double liability, but on the fact that he [or she] is threatened with double vexation in respect to one liability.' [Citation.]" [Citation.] "In an interpleader action, *the court initially* determines the right of the plaintiff to interplead the funds; if that right is sustained, an interlocutory decree is entered which requires the defendants to interplead and litigate their claims to the funds." [Citation.] Then, in the second phase of an interpleader proceeding, the trial court also has "the power under [Code of Civil Procedure] section 386 to adjudicate the issues raised by the interpleader action including: the alleged existence of conflicting claims regarding the interpleaded funds; plaintiffs' alleged position as a disinterested mere stakeholder; and ultimately the disposition of the interpleaded funds after deducting plaintiffs' attorney fees." [Citation.]'" (*Hood v. Gonzales* (2019) 43 Cal.App.5th 57, 71–72.)

III.

THE TRIAL COURT PROPERLY SUSTAINED THE DEMURRER

Stronghold contends the court erred by sustaining the demurrer to the interpleader complaint because the Bank was facing competing claims to the funds in the escrow account and threatened with liability by both Stronghold and the City. We conclude the court properly sustained the demurrer.

As explained in *Westamerica*, the Bank could distribute the retention funds in the escrow account to the City, as required by the escrow agreement and as provided in section 22300, without risk of double vexation.

12

(*Westamerica, supra*, 201 Cal.App.4th at p. 612.) As the escrow agent, the Bank's obligation is to comply with the escrow agreement. (*Ibid.*) "'An escrow holder is an agent and fiduciary of the parties to the escrow. [Citations.] The agency created by the escrow is limited—limited to the obligation of the escrow holder to carry out the instructions of each of the parties to the escrow. [Citations.] If the escrow holder fails to carry out an instruction it has contracted to perform, the injured party has a cause of action for breach of contract.'" (*Markowitz v. Fidelity Nat. Title Co.* (2006) 142 Cal.App.4th 508, 526.)

The escrow agreement, which is governed by section 22300, did not require the Bank to await a judicial determination of default before distributing the funds to the City. Under paragraph seven of the escrow agreement, the Bank, as the escrow agent, was required to disburse the retention funds to the City upon its demand and statement Stronghold had defaulted. The hold harmless clause in paragraph nine of the escrow agreement entitled the Bank to rely on the City's written notification of default and demand to draw upon the securities in the account without fear of liability. (*Westamerica, supra*, 201 Cal.App.4th at p. 613.)

The allegations of the first amended complaint combined with the escrow agreement's terms do not show the Bank faced a valid threat of double vexation. If the City's demand on the Bank was improper, a matter that may be resolved in the litigation on the construction contract, Stronghold has a remedy against the City under section 7107, which could include an award of penalties and attorney fees. Stronghold has no claim against the Bank for complying with the escrow agreement's terms. Therefore, we conclude the equitable remedy of interpleader was unavailable. "We see no reasonable probability that the Bank's compliance with the City's demand would subject

13

the Bank to double vexation, much less to 'double . . . claims . . . which are such that they may give rise to double . . . liability' (Code Civ. Proc., § 386, subd. (b))." (*Westamerica, supra*, 201 Cal.App.4th at p. 613.)

The trial court relied on *Westamerica* in sustaining the demurrer. Stronghold contends *Westamerica* is distinguishable and does not support the trial court's decision. Thus, a discussion of *Westamerica* is necessary to our analysis of Stronghold's claim.

In *Westamerica*, the Court of Appeal upheld a demurrer to a bank's complaint in interpleader after both the City of Berkeley and a contractor, who were separately litigating a contract dispute, sought the release of funds in a section 22300 escrow agreement. (*Westamerica, supra*, 201 Cal.App.4th at pp. 600–601, 603–605.) The facts in *Westamerica* are strikingly similar to the instant matter. There, the contractor and the City of Berkeley entered into a construction contract. (*Id.* at p. 602.) The contractor selected the option provided by section 22300 "to 'substitut[e] . . . securities for any moneys withheld by [the City] to ensure performance under a contract'" and deposited securities with the escrow bank. (*Westamerica*, at p. 603.) By doing so, the contractor was entitled to the full amount of its progress payments from the City of Berkeley. (*Ibid.*)

A few years later, the contractor sued the City of Berkeley for breach of the construction contract, and the City of Berkeley alleged in its answer the right to offsets due to defective work. (*Westamerica, supra*, at pp. 603–604.) The trial was divided into four phases. In the first phase, following a bench trial, the court ruled the contractor's action was barred for failure to comply with requirements for making a claim against a public entity. (*Id.* at p. 604.) The contractor appealed, and while the appeal was pending, the contractor sought a temporary restraining order to prevent the

14

City from obtaining the securities held in the escrow account. (*Ibid.*) With the contractor's application for a temporary restraining order pending, the City of Berkeley sent a letter to the bank stating the contractor was in default and demanding the bank release the entire retention amount to the City of Berkeley pursuant to the escrow agreement. (*Ibid.*) The contractor sent a letter to the bank objecting to the City of Berkeley's demand and disputing the city had any right to the securities because the project had been deemed complete several years prior and the City of Berkeley did not declare a default during the construction. (*Ibid.*) The contractor threatened the bank with legal action if it released any of the funds to the City of Berkeley. (*Ibid.*)

The bank filed a complaint in interpleader. (*Westamerica, supra*, 201 Cal.App.4th at p. 605.) The court sustained the City of Berkeley's demurrer to the complaint "not on the ground that no interpleader cause of action was stated, but on the alternative ground of exclusive concurrent jurisdiction," because a different court had jurisdictional priority over the construction contract between the contractor and the City of Berkeley. (*Id.* at p. 606.) The Court of Appeal affirmed the dismissal but on different grounds. The appellate court concluded the escrow agreement's terms were clear, explaining: "The Legislature has spelled out a brief and specific list of rights and duties which are both circumscribed and mutually exclusive. The Bank must pay to [the contractor] the interest accrued on the escrowed securities upon demand by [the contractor]; no notice to the City is required. Similarly, when the City notifies the Bank of a default and demands distribution of all or part of the escrowed funds, the Bank must 'immediately' comply with that demand. Any disbursement of the escrowed securities to [the contractor] requires written authorization from the City. As for the Bank, it 'shall rely on the written notifications' specified in the agreement, and the City and [the

15

contractor] 'shall hold [the Bank] harmless' when it complies with the disbursements required by the instructions. [Citation.] No other documentation is required from either party.'" (*Id.* at pp. 608–609.)

In *Westamerica*, the bank asserted it was entitled to interpleader because it faced "'conflicting instructions'" regarding whether the funds should be released to the City of Berkeley. (*Westamerica, supra*, 201 Cal.App.4th at p. 609.) The Court of Appeal disagreed, stating: "[T]he Bank cites to no provision in the escrow agreement that would contractually obligate it to accede to [the contractor]'s request to halt the liquidation and disbursement of the securities in the face of the City's demand. Indeed, any claim by [the contractor] that it has a *contractual* right to demand that the securities be withheld would constitute a unilateral change in the terms of the escrow agreement, which is not permitted, either under common law [citation], or by statute [citation]." (*Id.* at p. 610.) Rejecting the bank's allegation it could not "'safely'" determine how to proceed given the conflicting instructions, the Court of Appeal explained: "The terms of the statutory agreement direct the Bank's choice. If the Bank complies with the City's written notice, it will be held harmless. Only by refusing to comply will the Bank be subject to unprotected litigation for breach of the agreement." (*Id.* at p. 609.)

The Court of Appeal continued: "Our conclusion that the escrow agreement authorizes the City unilaterally to declare a default and to receive a distribution of the escrowed securities comports fully with the fundamental purpose of retentions. As we have discussed, retained earnings serve as an incentive for timely completion of the contract. They are effective for this purpose precisely because they are under the control of the owner who can use them if the contractor defaults on his obligations. [Citation.] Of course,

16

the owner does so at its peril and can be subject to hefty penalties and attorney fees if it is shown that all or part of the retention should have been released to the contractor. (§ 7107.) The statutory scheme thus provides to the contractor a powerful remedy for wrongful withholding of the retention fund, but it does not allow the contractor to obstruct the public entity's control over it. The Bank's theory would require a different result for escrowed retention funds, viz., the mere threat of suit by the contractor could force the owner into litigation in order to access *its own* retention fund. We do not think the Legislature intended that public entities be disadvantaged in this way when it adopted the law requiring that contractors be allowed to substitute escrowed funds for retentions." (*Westamerica, supra*, 201 Cal.App.4th at pp. 610–611.) The appellate court stated it had reviewed the legislative history for the original statute authorizing contractors to substitute escrowed securities for retentions (former Gov. Code, § 4590) and found nothing suggesting a different result. (*Westamerica*, at p. 611.)

Two other cases considering escrow agreements prescribed by section 22300 have reached similar conclusions. In *Opinski*, decided a couple of months prior to *Westamerica*, the Court of Appeal reversed an award of prejudgment interest where the city had prevailed in a dispute over a construction contract, holding the city was the owner of the money in the escrow account that was awarded as damages and therefore the city was not entitled to prejudgment interest. (*Opinski, supra*, 199 Cal.App.4th at pp. 1118–1121.) In *Pittsburg*, the Court of Appeal relied on *Westamerica* and *Opinski* in concluding a contractor, who had elected pursuant to section 22300 to have retention held in an escrow account, was not entitled to a preliminary injunction preventing the public entity from withdrawing the retention funds until a court determined the contractor had defaulted.

17

(*Pittsburg, supra*, 232 Cal.App.4th at pp. 811–812.) The Court of Appeal in *Pittsburg* rejected the contractor's proposed rule requiring a public project owner to await judicial resolution of the underlying contract dispute before withdrawing retention funds, stating such was "unsupported by logic or law" and "would undermine the entire purpose for retention." (*Id.* at p. 812.)

Stronghold has not cited a case reaching a result contrary to those in *Westamerica*, *Opinski*, or *Pittsburg*. It focuses its argument on attacking and distinguishing *Westamerica*. Stronghold argues *Westamerica* is in tension with *Hancock Oil Co. v. Hopkins* (1944) 24 Cal.2d 497 (*Hancock*). We disagree. *Hancock* addressed Code of Civil Procedure section 386 and basic interpleader principles in addressing whether a tenant could "interplead his landlord and a stranger to the lease where both claim the rent." (*Hancock*, at p. 502.) *Hancock* makes a broad statement "[i]nterpleader is allowed in favor of a bank against rival claimants to a bank deposit" (*id.* at p. 509), but it does not discuss a bank's ability to interplead when a claim is made in conformance with an escrow agreement governed by Public Contract Code section 22300. And section 22300 does not change basic interpleader principles discussed in *Hancock*. *Hancock* is inapposite to the matter before us.

Stronghold contends *Westamerica* is distinguishable for two reasons. First, Stronghold asserts the circumstances of this case are different because no court has yet addressed the parties' rights to the retention funds and the City has not "preserved a claim" Stronghold defaulted, entitling the City to release of the funds. But as *Westamerica* and *Pittsburg* make clear, no litigation or judicial determination is necessary before the public entity, as the owner of the retention funds, can declare a default and demand the funds by notice to the escrow agent. The Court of Appeal in *Pittsburg*, quoting

18

*Westamerica*, explained there is "no ambiguity on this point," a section 22300 escrow agreement "'authorizes the City *unilaterally* to declare a default and receive a distribution of the escrowed securities [as this] comports fully with the fundamental purpose of retentions.'" (*Pittsburg, supra*, 232 Cal.App.4th at p. 819.) Stronghold does not convince us to conclude otherwise.

Second, Stronghold asserts there is a significant distinction between this case and *Westamerica* because here the Bank had reason to "question whether the owner had declared a default at all." In *Westamerica*, the Court of Appeal noted the bank had not alleged the City of Berkeley's "written notification of default and demand for distribution of the retention fund [was] *itself* insufficient or defective" but alleged only that the contractor had "called into question the facts upon which the notification and demand [were] predicated." (*Westamerica, supra*, 201 Cal.App.4th at p. 612.) We simply do not see a meaningful distinction here. At its core, Stronghold is making the same challenge to the predicate facts underlying the declaration of default as the contractor in *Westamerica*. It is possible the determination of whether Stronghold defaulted will be made in the separate litigation concerning the construction contract; that determination was not necessary here prior to the City's written notification of default and demand of the retention funds from the Bank.

In sum: "The escrow instructions are clear. The deposited securities are held in the name of the City, and [Stronghold] is designated the 'beneficial owner.' As the beneficial owner, [Stronghold] is unconditionally entitled to distribution of all the interest generated by the securities, but it has no legal or contractual right to all or any part of the principal without written authorization of the City. If the City gives notice of the contractor's default and demands liquidation of the securities and distribution of the

19

funds, the Bank must 'immediately convert the securities to cash and . . . distribute the cash as instructed by the City.' The hold harmless clause entitles the Bank to rely upon the prescribed written notifications, *vel non*." (*Westamerica, supra*, 201 Cal.App.4th at p. 612.)

Accordingly, we affirm the judgment of dismissal following the trial court's sustainment of the City's demurrer without leave to amend.

## DISPOSITION

The judgment of dismissal is affirmed. The City of Monterey's request for judicial notice is granted. The City of Monterey is entitled to costs on appeal.

MOTOIKE, J.

WE CONCUR:

SANCHEZ, ACTING P. J.

DELANEY, J.

20